TIMOTHY COURCHAINE
United States Attorney
District of Arizona
RYAN MCCARTHY
Assistant U.S. Attorney
Arizona State Bar No. 029804
STEPHEN MARLOWE
Assistant U.S. Attorney
California Bar No. 353337
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: Ryan.McCarthy@usdoj.gov
Email: Stephen.Marlowe@usdoj.gov
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | |
|---|---|
| Plaintiff, | Case No. CR-26-0455-PHX-DJH |
| v. | |
| Gabriel Mendoza-Acoltzi, | **MEMORANDUM IN SUPPORT OF DETENTION** |
| Defendant. | |

Defendant Gabriel Mendoza-Acoltzi's actions have already demonstrated two things. First, he is willing to send a political message using violence—to him, that is the right thing to do. Second, when law enforcement attempts to apprehend him, he will flee. Add to that Defendant's (1) significant ties to foreign nations, (2) mental-health struggles, (3) daily marijuana use, (4) lack of ties to this District, and (5) a 5-year mandatory minimum sentence on one of his charges. The result is a lack of conditions that can assure Defendant's voluntary appearance or the safety of the community.

## I.    BACKGROUND

On the evening of February 20, 2026, Defendant set out in his Honda Civic on a mission: send a violent political message by setting fire to a future Immigration and Customs Enforcement ("ICE") facility. His plan was to burn down the entire facility. That is why,

before setting the fire, he went to the nearby water main to try to cut off the water supply to the 418,400-square-foot building's sprinkler system.[1] His plan was also to throw in an explosion—an additional exclamation point on his violent political message. That is why he brought along a propane tank that he would later use to break a window and eventually hurl into the building with the valve open.

A review of nearby video surveillance showed that at approximately 12:00 a.m. on February 21, 2026, Defendant drove his Civic into the parking lot of the ICE property via the southwest driveway. Wearing light pants, light shoes, and a dark, hooded jacket, Defendant exited the driver's side and walked to the passenger side door of his vehicle at approximately 12:08 a.m. Defendant used both hands to carry a box across the parking lot and placed it near a bush next to the ICE property just north of the lobby.  Defendant returned to his Civic and removed a propane tank from the passenger side of the Civic and placed it next to the weighted box.

At approximately 12:09 a.m., Defendant walked to the entrance of the southwest driveway and stood where a water main valve was located. Investigators obtained video from a business across the street from the ICE facility that showed Defendant illuminating the water main valve, possibly with a cellular telephone, and examining it, before apparently determining it could not be turned off (likely because of the locks on the water main). Defendant returned to the Civic and drove out of the parking lot at approximately 12:11 a.m., leaving the box and propane tank near the bush.

---

[1] Thankfully, the shutoff was locked. And thankfully, there are no known injuries or fatalities from the fire.

2



At approximately 12:39 a.m., Defendant appeared at the far north end of the ICE property and was seen going back and forth between the rock landscaping and the sidewalk. The first ICE ERO Deportation Officers who responded to the ICE property after being alerted by local police advised they observed the words "FUCK ICE"[2] spelled out on the sidewalk with landscaping rocks in this same area. At approximately 12:40 a.m., Defendant began walking southbound along the west side of the ICE property directly to the items that had been left by the bush and knelt over the items for some time.

At approximately 1:00 a.m., Defendant moved the box and propane tank closer to the lobby entrance of the building and swung what appeared to be a handheld tool at the lower right corner of the lower right windowpane to the left of the lobby doors and broke the tempered glass. At approximately 1:04 a.m., Defendant swung the propane tank at the window twice, causing the tempered glass to shatter to the ground.



---

[2] Defendant claimed in his interview with investigators that he was not responsible for these words written in the rocks. He indicated that he saw the rocks, and agreed with the message, but he claimed he did not arrange them himself.

Just after using the propane tank to break the window, Defendant put his right hand in the front pocket of his hooded sweatshirt to remove something just before picking up a long item from the ground. Investigators discovered that Defendant utilized a long torch connected to the propane tank with a hose to light the window shades inside the lobby on fire. Defendant then lit the box on fire and at 1:05 am tossed the box through the broken window of the ICE property.

 

Defendant then knelt next to the propane tank and twisted the top valve multiple times before he tossed the propane tank through the broken window. Defendant picked up his torch and ran northbound on the sidewalk from which they had originally walked. At approximately 1:08 a.m., Defendant disappeared from camera view behind the north end of the ICE property.

The water suppression system in the building initiated to suppress the fire. When investigators arrived, they recovered a burnt cardboard box filled with charcoal, and an open propane tank from the lobby area. Although Defendant did not succeed in burning the building down, he caused significant damage to the building. To this point, ICE has paid over $40,000 in repairs with a total repair quote of over $400,000.

Defendant's actions show planning intended to cause maximum damage and maximum deterrence of the United States government and its public servants in their work. Defendant appears to see himself and his violent actions as noble. And although he was unable to burn down the building, he did cause damage of approximately $400,000.

4



A Grand Jury indicted Defendant with Malicious Damage to Federal Property (18 U.S.C. § 844(f)(1)) and Willful Depredation Against Property of the United States (18 U.S.C. § 1361). Just as Defendant had not accounted for the lock on the water main, he also had not accounted for the diligence of the FBI in meticulously collecting and piecing together a very strong web of evidence placing Defendant at the scene of his crimes.

After obtaining an arrest warrant, law enforcement encountered Defendant outside of his apartment building. He ran. He made it about eighty yards before agents caught up with him and tackled him. It took three agents to restrain Defendant safely and place him under arrest.

Defendant waived his *Miranda* rights and agreed to speak with investigators. Defendant readily admitted to setting fire to the building. Defendant said he "did it out of protest." He admitted he knew that DHS had recently purchased the building and were planning to use it. Defendant said he wanted to stop DHS from "hurting his people." Defendant said he just decided one night to "go be Batman." Defendant explained how he lit fire to the building. Defendant said he walked over to the water main because "[he] wanted to see if [he] could shut it off, in case the sprinklers were activated … that was my whole plan to let it actually burn." Defendant said he used a hammer to break open the lobby

window. Defendant said that he used a propane tank and blow torch "to blow anything that would catch on fire." Defendant said he threw in the propane tank and that he thought the propane tank would blow up the doors to the lobby.

Not has Defendant already fled, he also has significant ties to foreign countries where he could conveniently flee if released. First, although he is a U.S. citizen, he is also a citizen of Mexico, a country to which he has traveled five times and where he has extended family. Defendant also has extended family in Brazil, a country whose flag he displayed from the rearview mirror of his Civic. He has traveled to Brazil twice. Fleeing would potentially allow Defendant to escape a lengthy term of imprisonment. The mandatory minimum on Count 1 of the Indictment is five years' imprisonment.

## II.   LEGAL STANDARD

Pretrial release necessitates conditions of release that can reasonably assure the defendant's appearance and the safety of the community; the lack of such conditions requires pretrial detention. 18 U.S.C. § 3142(e). The United States bears the burden of showing (by a preponderance of the evidence) that the defendant poses a flight risk and (by clear and convincing evidence) that the defendant is a danger to any other person or the community. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991); 18 U.S.C. § 3142(f)(2)(B).

In considering the issue of detention, the Court "must take into account available information concerning"

(1) the nature and circumstances of the offense charged,

(2) the weight of the evidence against the person,

(3) the history and characteristics of the person, including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug and alcohol abuse, criminal history, record concerning appearance at court proceedings,

6

(4) and the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985).

At the detention hearing, the United States may proceed by way of proffer. *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986). Moreover, the Federal Rules of Evidence do not apply to evidence introduced during the detention hearing, and the Court may therefore consider hearsay evidence. 18 U.S.C. § 3142(f); Fed. R. Evid. 1101(d)(3).

### III.    ARGUMENT

Recent history shows that Defendant is ready, willing, and able to advocate his political beliefs through violence, and to do so remorselessly. Recent history also shows that if given the opportunity, Defendant will likely abscond. He has every incentive to do so. His criminal liability is all but assured if he remains in the United States. He has extended family and citizenship in Mexico, plus more extended family in Brazil. He has traveled to both countries multiple times. The temptation to slip across the border and leave his criminal liability behind is strong.

### A.    Defendant Is a Danger to the Community

Defendant is not an amateur vandal. He is a violent political actor. His plan, if fully successful, would have resulted in the complete destruction of a 418,400-square-foot ICE building and an explosion, all intended to send an anti-government, anti-law-enforcement message. Even his partial success resulted in approximately $400,000 in loss, not to mention the resources of local fire and police. Defendant's statements show that he is not taking his violent offenses with nearly the appropriate amount of seriousness. To the contrary, Defendant appears to think his terroristic conduct should be applauded.

Although there are no known injuries, continuing down the path of terror that Defendant is on could lead to acts of violence that do cause injury—either directly or for first responders. Moreover, even without casualties, arson frequently causes harm to the

community by polluting the air, especially for vulnerable members of the community with heightened sensitivity to toxic smoke inhalation.

### B.    Defendant Is a Flight Risk

No guesswork is necessary to determine Defendant's willingness to flee and resist arrest. He already has already shown that he will do so, even with agents in pursuit. On top of that, Defendant's daily use of marijuana and mental health struggles do not place him in a position to resist the impulse to abscond. Defendant's home state of Washington also makes his voluntarily return to Arizona for felony prosecution less likely—especially where the evidence is strong and the punishment, potentially severe.

Mexico and Brazil provide readily available havens for Defendant and make seizing the opportunity to flee much more likely. Defendant has strong ties to those countries: extended family in Brazil, and in Mexico, both extended family and citizenship. Under these circumstances, Defendant's pretrial release would simply provide another opportunity to carry out more successfully the flight he already attempted when arrested. His criminal conduct and flight have already shown that he has zero respect for government authority. It is highly unlikely that he would obey an order of this Court to appear for further proceedings.

### IV.    CONCLUSION

Most individuals advocate their political views peacefully and comply when law enforcement lawfully attempts to stop or arrest them. Others try to force political change through violence and flee and resist lawful arrest. Defendant—a self-proclaimed "Batman"—is in the second group. The Court should detain him pending trial.

Respectfully submitted this 13th day of May 2026.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

*s/ Ryan McCarthy*
RYAN MCCARTHY
Assistant United States Attorney

8

*s/ Stephen Marlowe*
STEPHEN MARLOWE
Assistant United States Attorney

9