TIMOTHY COURCHAINE
United States Attorney
District of Arizona
RYAN MCCARTHY
Assistant U.S. Attorney
Arizona State Bar No. 029804
STEPHEN MARLOWE
Assistant U.S. Attorney
California Bar No. 353337
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: Ryan.McCarthy@usdoj.gov
Email: Stephen.Marlowe@usdoj.gov
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Gabriel Mendoza-Acoltzi,<br><br>　　　　Defendant. | Case No. CR-26-0455-PHX-DJH<br><br>**OPPOSITION TO DEFENDANT'S MOTION TO REVOKE OR MODIFY DETENTION ORDER** |

Defendant's motion offers no good reason to deviate from the Magistrate Judge's ruling that he be detained. The record amply supports that ruling, and upon *de novo* review, this Court should reach the same conclusion. Defendant is a flight risk and a danger to the community, and no conditions can reasonably assure his further appearance or the safety of the community.

## I.　　LEGAL STANDARDS

### a.　Standard of Review of Detention Order

The Court reviews detention orders *de novo*. *United States v. Koening*, 912 F.2d 1190, 1191-93 (9th Cir. 1990). The Court "make[s] its own independent determination" based on its review of the evidence before the Magistrate Judge. *Id.* at 1193. There is

deference to the Magistrate Judge, but there is also no "require[ment] to hold an evidentiary hearing when no evidence is offered." *Id.* In such cases, expanding review beyond the record as it stands depends on whether doing so is "necessary or desirable" to the Court. *Id.*

### b. Legal Standard for Detention

Pretrial release necessitates conditions of release that can reasonably assure the defendant's appearance and the safety of the community; the lack of such conditions requires pretrial detention. 18 U.S.C. § 3142(e). The United States bears the burden of showing (by a preponderance of the evidence) that the defendant poses a flight risk and (by clear and convincing evidence) that the defendant is a danger to any other person or the community. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991); 18 U.S.C. § 3142(f)(2)(B).

The Court "must take into account available information concerning":

(1) the nature and circumstances of the offense charged,

(2) the weight of the evidence against the person,

(3) the history and characteristics of the person, including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug and alcohol abuse, criminal history, record concerning appearance at court proceedings,

(4) and the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985).

## II.  BACKGROUND

On the evening of February 20, 2026, Defendant set out in his Honda Civic on a mission: send a political message through violence by setting fire to a future Immigration and Customs Enforcement ("ICE") facility. His plan was to burn the expansive facility to the ground. That is why, before setting the fire, he went to the nearby water main to try to

cut off the water supply to the 418,400-square-foot building's sprinkler system.[1] His plan was also to throw in an explosion—an additional exclamation point on his violent political message. That is why he brought along a propane tank that he would later use to break a window and eventually hurl into the building with the valve open.

A review of nearby video surveillance showed that at approximately 12:00 a.m. on February 21, 2026, Defendant drove his Civic into the parking lot of the ICE property via the southwest driveway. Wearing light pants, light shoes, and a dark, hooded jacket, Defendant exited the driver's side and walked to the passenger side door of his vehicle at approximately 12:08 a.m. Defendant used both hands to carry a box across the parking lot and placed it near a bush next to the ICE property just north of the lobby. Defendant returned to his Civic and removed a propane tank from the passenger side of the Civic and placed it next to the weighted box.

At approximately 12:09 a.m., Defendant walked to the entrance of the southwest driveway and stood where a water main valve was located. Investigators obtained video from a business across the street from the ICE facility that showed Defendant illuminating the water main valve, possibly with a cellular telephone, and examining it, before apparently determining it could not be turned off (likely because of the locks on the water main). Defendant returned to the Civic and drove out of the parking lot at approximately 12:11 a.m., leaving the box and propane tank near the bush.

 

---

[1] Thankfully, the shutoff was locked. And thankfully, there are no known injuries or fatalities from the fire.

At approximately 12:39 a.m., Defendant appeared at the far north end of the ICE property and was seen going back and forth between the rock landscaping and the sidewalk. The first ICE ERO Deportation Officers who responded to the ICE property after being alerted by local police advised they observed the words "FUCK ICE"[2] spelled out on the sidewalk with landscaping rocks in this same area. At approximately 12:40 a.m., Defendant began walking southbound along the west side of the ICE property directly to the items that had been left by the bush and knelt over the items for some time.

At approximately 1:00 a.m., Defendant moved the box and propane tank closer to the lobby entrance of the building and swung what appeared to be a handheld tool at the lower right corner of the lower right windowpane to the left of the lobby doors and broke the tempered glass. At approximately 1:04 a.m., Defendant swung the propane tank at the window twice, causing the tempered glass to shatter to the ground.



Just after using the propane tank to break the window, Defendant put his right hand in the front pocket of his hooded sweatshirt to remove something just before picking up a long item from the ground. Investigators discovered that Defendant utilized a long torch connected to the propane tank with a hose to light the window shades inside the lobby on fire. Defendant then lit the box on fire and at 1:05 am tossed the box through the broken window of the ICE property.

---

[2] Defendant claimed in his interview with investigators that he was not responsible for these words written in the rocks. He indicated that he saw the rocks, and agreed with the message, but he claimed he did not arrange them himself.

 

Defendant then knelt next to the propane tank and twisted the top valve multiple times before he tossed the propane tank through the broken window. Defendant picked up his torch and ran northbound on the sidewalk from which they had originally walked. At approximately 1:08 a.m., Defendant disappeared from camera view behind the north end of the ICE property.

The water suppression system in the building initiated to suppress the fire. When investigators arrived, they recovered a burnt cardboard box filled with charcoal, and an open propane tank from the lobby area. Although Defendant did not succeed in burning the building down, he caused significant damage to the building. To this point, ICE has paid over $40,000 in repairs with a total repair quote of over $400,000.

Defendant's actions show planning intended to cause maximum damage and maximum deterrence of the United States government and its public servants in their work. Defendant appears to see himself and his violent actions as noble. And although he was unable to burn down the building, he did cause damage of approximately $400,000.



A Grand Jury indicted Defendant with Malicious Damage to Federal Property (18 U.S.C. § 844(f)(1)) and Willful Depredation Against Property of the United States (18 U.S.C. § 1361). Just as Defendant had not accounted for the lock on the water main, he also had not accounted for the diligence of the FBI in meticulously collecting and piecing together a very strong web of evidence placing Defendant at the scene of his crimes.

After obtaining an arrest warrant, law enforcement encountered Defendant outside of his apartment building. He ran. He made it about eighty yards before agents caught up with him and tackled him. It took three agents to restrain Defendant safely and place him under arrest.

Defendant waived his *Miranda* rights and agreed to speak with investigators. Defendant readily admitted to setting fire to the building. Defendant said he "did it out of protest." He admitted he knew that DHS had recently purchased the building and were planning to use it. Defendant said he wanted to stop DHS from "hurting his people." Defendant said he just decided one night to "go be Batman." Defendant explained how he lit fire to the building. Defendant said he walked over to the water main because "[he] wanted to see if [he] could shut it off, in case the sprinklers were activated … that was my whole plan to let it actually burn." Defendant said he used a hammer to break open the lobby window. Defendant said that he used a propane tank and blow torch "to blow anything that would catch on fire." Defendant said he threw in the propane tank and that he thought the propane tank would blow up the doors to the lobby.

## III.  DETENTION HEARING

On May 14, 2026, a detention hearing was held before United States Magistrate Judge Morrissey. The Government sought Defendant's detention based on a serious risk of flight and a danger to the community. Defendant argued through his counsel, as he does again on appeal, that the Defendant is not a risk flee given his age, resources, and his history and characteristics and that the underlying facts do not show that he is a danger to the community. Judge Morrissey issued an order detaining Defendant finding by clear and

convincing evidence the defendant is a danger to the community and by a preponderance of evidence the defendant is flight risk. (CR 18.)

## IV.   ARGUMENT

Recent history shows that Defendant is ready, willing, and able to advocate his political beliefs through violence, and to do so remorselessly. Recent history also shows that if given the opportunity, Defendant will likely abscond. He has every incentive to do so. His criminal liability is all but assured if he remains in the United States. He has extended family and citizenship in Mexico, plus more extended family in Brazil. He has traveled to both countries multiple times. The temptation to slip across the border and leave his criminal liability behind is strong.

### A.   Defendant Is a Danger to the Community

The proffered evidence is that Defendant attempted to send a political message through violence—and sees himself as a hero for doing so. He argues there was no violence because (thankfully) there were no injuries or fatalities. But violence does not always result in bodily harm. Attempting to burn down a massive building, with an accompanying explosion, is one example of such violence. Defendant's plan, if fully successful, would have resulted in the complete destruction of a 418,400-square-foot ICE building and an explosion, all intended to send an anti-government, anti-law-enforcement message.

To Defendant, that is the right thing to do. That is what Defendant believes a superhero would do, as he implied in his post-arrest interview. Even now, Defendant points to the supposed "righteousness" of his motivations, although he also claims that he is "beginning to feel remorse" and assures the Court of the "possibility of genuine reflection" in time. *Id. See* Doc. 19, at 10.

Defendant's attempt to downplay the seriousness of the alleged conduct by arguing this was not a 'violent' act, falls flat. If Defendant had been successful, the fire would have raged throughout the expansive facility, as the water would have been cut off. Massive fires such as Defendant intended to set can harm first responders even if the structure is

7

unoccupied. If they sweep out of control, they can also threaten the community. And as the Magistrate Judge pointed out, "there are many cases . . . where an unoccupied structure ends up being occupied." (May 14, 2026, Tr. 12:1-4.) What is more, simply the smoke from such fires can easily harm community members, especially vulnerable members of the community with heightened sensitivity to toxic smoke inhalation.

Defendant also stresses his lack of criminal history as supposed proof that he is not a danger. But that does not preclude detention here. One can still be detained as a danger to the community "despite the fact that he had no prior criminal or violent history." *United States v. Hir*, 517 F.3d 1081, 1090-91 (9th Cir. 2008). Defendant's statements show that he is not taking his violent offenses with nearly the appropriate amount of seriousness. His nonchalant attitude toward the alleged conduct suggests that he does not see using destructive violence to make a political point as a problem.

**B.    Defendant Is a Flight Risk**

No guesswork is necessary to determine Defendant's willingness to flee and resist arrest. He already has already shown that he will do so, even with agents in pursuit. Defendant takes pains to explain his fleeing from law enforcement. However, the basic facts remain, Defendant's instinct was to flee from FBI agents and then struggle against them when they attempted to place him in handcuffs.

On top of that, Defendant's marijuana use (however small) and mental health struggles do not place him in a position to resist the impulse to abscond. Defendant's home state of Washington also makes his voluntarily return to Arizona for felony prosecution less likely—especially where the evidence is strong and the punishment potentially severe.

Not only has Defendant already fled, he also has significant ties to foreign countries where he could conveniently flee if released. First, although he is a U.S. citizen, he is also a citizen of Mexico, a country to which he has traveled five times and where he has extended family. Defendant also has extended family in Brazil, a country whose flag he displayed from the rearview mirror of his Civic. He has traveled to Brazil twice. Fleeing would

8

potentially allow Defendant to escape a lengthy term of imprisonment. The mandatory minimum on Count 1 of the Indictment is five years' imprisonment.

Mexico and Brazil provide readily available havens for Defendant and make seizing the opportunity to flee much more likely. Defendant has strong ties to those countries: extended family in Brazil, and in Mexico, both extended family and citizenship. Under these circumstances, Defendant's pretrial release would simply provide another opportunity to carry out more successfully the flight he already attempted when arrested. Giving up his passports would not prevent his fleeing to Mexico. His criminal conduct and flight have already shown that he has zero respect for government authority. It is highly unlikely that he would obey an order of this Court to appear for further proceedings.

## V.      CONCLUSION

Most individuals advocate their political views peacefully and comply when law enforcement lawfully attempts to stop or arrest them. Others try to force political change through violence and flee and resist lawful arrest. Defendant—a self-proclaimed "Batman"—is in the second group. The Court should deny Defendant's motion and affirm the order of detention pending trial.

Respectfully submitted this 31st day of May, 2026.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

s/ Ryan McCarthy
RYAN MCCARTHY
Assistant United States Attorney

s/ Stephen Marlowe
STEPHEN MARLOWE
Assistant United States Attorney

9